*In the matter of the order of the arrest of the* Hon. B. M. Pearson, *Associate Justice, and in reply to the expunging resolutions adopted by the majority of the Court.*

1. A Court has full power and authority to enforce the attendance of its members.

2. The Judges are officers of the Court, and not above the law nor exempt from the compulsory process of the Court.

3. This power is not confined, as is alleged, to inferiors and subordinates, as Circuit Judges, Attorneys, Jurors, Witnesses, Justices of the Peace, Clerks, Sheriffs, &c.

4. It is inherent in the Court, affirmed by statute and its own decisions, and is indispensable to its very existence and preservation. The power does not pertain to the Chief Justice, but to the Judge or Judges present at the time fixed by law for holding the Court.

5. Rescinding and expunging resolutions or orders and protests are wholly unknown in judicial proceedings and not entitled to the sanction of Courts of Justice.

Opinion by BALTZELL, C. J.

In the latter part of last year, I received from Judge Pearson an official note, dated Jacksonville, 28th December, informing me, that "the condition of his eyes was such as to preclude him from doing justice to his official station and to himself, and requesting that a Circuit Judge be appointed to take his place." To this I made prompt and immediate answer, that, " in my opinion, it could not be done consistently with official propriety." To this he

replied by letter, dated the 4th of January, acknowledging the receipt of mine, but expressive of "regret that his absence should work any prejudice to the right of parties litigant by virtue of your (my) decision, and would respectfully suggest *an adjournment until after. the subsequent terms*, when I hope to be with you then."

The very proposal for the adjournment of all the terms' appeared to me to indicate a purpose on his part to allow them to pass away without the transaction of the public business. It then became matter of serious consideration what should be done under the circumstances. If there had been inability from sickness or other sufficient cause, I should have been the last to complain of his absence; but, as I conceived the cause alleged did not amount to a sufficient excuse, the infirmity being one that existed at the last terms of the Court—not at all aggravated—not in the slightest degree increased. It commenced at Jacksonville and continued to prevail through the succeeding terms of the past year—at Tampa, Marianna and Tallahassee—with entire inability on his part to read a single word, a brief or authority cited, or write a single opinion; the labor of the entire term, with the exception of his sitting on the bench and joining in consultations, having thus been devolved upon his associates. The labor I was willing to have assumed again. There was an additional reason for not allowing his statement as a satisfactory excuse. If disabled or disqualified so as to make the appointment of a Circuit Judge legal and proper, his acting at all, whilst under the disability, was improper, as the decisions in which he concurred might for this reason be justly questionable or even deemed invalid. Moreover, he had assured his brother Judges, that in the event the infirmity continued, or was not relieved by the next term, he would resign. I had a full conviction, too, that the

appointment of a Judge for the term was not only not provided for by the law, but prohibited by the Constitution. Still further desirous of satisfying myself, I inquired of citizens direct from Jacksonville, of the highest respectability and standing, as to his condition, and was informed that he was in better health than usual and engaged in his ordinary pursuits. The result of these inquiries was a belief upon my mind of a decided disregard and refusal on his part to perform the duty of his official station. In this connection, it is important to notice the action of the Court at this period. The third of January being the first Monday, was the day fixed by law for holding the Supreme Court at Tallahassee. On that day was present the C. Justice; on the 4th, the C. J. and Associate Justice DuPont. The Court was then adjourned until the 11th, when the C. J. was present. On the 12th and 13th he was present alone. On the latter day the Court was adjourned to the 17th. On the 18th, present the Chief Justice, when an order was made to notify the two Associates to be present on the 24th, with a further order for the attachment of the Hon. B. M. Pearson. On the 24th, present the C. J. and Associate DuPont, when the C. J. proposed to proceed with the business, but Associate Justice DuPont not concurring, the Court was adjourned to the Court in course.

It will thus be seen that no term was held for the transaction of business, owing to the failure of one Associate to attend and of the objection of the other to proceeding with the business in the absence of that Associate, and thus a high co-ordinate department of the government, vested with the most important powers for the preservation of the public peace, of social order, of the administration of justice, was about to be rendered totally inefficient by this suspension of its vital functions.

To me above all others, occupying the responsible position of presiding officer, the question addressed itself with irresistible prominence and force whether there was not power in the Court itself, for redress in such emergency, or was the tribunal wholly impotent and powerless. I deemed it due to those who, in a generous confidence, had reposed in me so high and sacred a trust—to my own deep sense of responsibility—to the integrity of the Court, the character of the State, the maintenance of the government itself, that a remedy, if any existed adequate to the occasion, should be applied. In a matter of such serious moment all merely personal considerations, either in reference to others or to myself, did not, as they were not permitted to, have the slightest weight. The question was one, indeed, affecting the very existence of the Court. There was no time for investigation, nor search for precedents, but the event made it incumbent on those having control of the matter to use the means within their reach, without regard to nice and arbitrary distinctions. To save, to rescue from peril, confers extraordinary power. Resources then, are the suggestions of the occasion, and when resorted to in questions of great moment, are not objectionable that they are not of ordinary application. It was easy to see, that if one Judge could, by his absence from Court, impede its progress, arrest its action and subvert its power, the great object of its institution would be defeated. Even when present, he could effect the same purpose by contumelious behavior, refusing to sit in conference—to vote in the trial of cases and by other expedients. He would thus be armed with the power, to be wielded at his own will, of attacking the Court, obstructing its proceedings, of threatening its action, defying its authority, and assailing it at every step, and this department would thus be exhibited stripped of its legitimate

power and defenceless before one of its own members. Such results would be in direct conflict with the established maxim that every department of the government possesses inherent power adequate to its own protection and fully commensurate to the objects of its creation.

This principle was the basis of the decision of the great case of Cohens vs. the State of Virginia, in which the important question arose whether a sovereign State was subject to the jurisdiction of the Federal Courts. That profound and distinguished jurist, C. J. Marshall, delivered the opinion of the Court. It presents so many views coincident with those we have expressed that we make copious extracts, in order to show the analogy:

"The questions presented to the Court by the two first points made at bar are of great magnitude, and may be truly said vitally to affect the Union. This excludes the enquiry whether the Constitution and laws of the United States have been violated by the judgment which the plaintiffs in error seek to review and maintain; that admitting such violation, it is not in the power of the government to apply a corrective. They maintain that the nation does not possess a department capable of restraining peaceably and by authority of law any attempt which may be made by a part against the legitimate powers of the whole, that the government is reduced to the alternative of submitting to such attempts or of resisting them by force.

"The jurisdiction of the Court, then, being extended by the letter of the Constitution to all cases arising under it, or under the laws of the U. S., it follows that those who would withdraw any case of this description from that jurisdiction, must sustain the exemption they claim in the spirit and true meaning of the Constitution; which spirit and true meaning must be so apparent as to overrule the

Opinion by the Chief Justice.

words which its framers have employed. It was contended that a State was sovereign and therefore not suable nor subject to the jurisdiction of the Federal Courts. While weighing arguments," said the Court, "drawn from the nature of government and from the genial spirit of an instrument and urged for the purpose of narrowing the construction which the words of that instrument seem to require, it is proper to place in opposite scale those principles drawn from the same source which go to sustain the words in their full operation and import. One of those which has been pressed with great force by the counsel for the plaintiffs in error is, that the judicial power of every well constituted government must be *co-extensive with the legislative*, and must be capable of deciding every judicial question which grows out of the Constitution and laws.

"If any proposition may be considered as a political axiom, this, we think, may be so considered. In reasoning upon it as an abstract question, there would probably exist no contrariety of opinion respecting it. Every argument proving the necessity of the department proves also the propriety of giving this extent to it. The mischievous consequences contended for on the part of Virginia are also entitled to great consideration. It would *prostrate*, it has been said, *the government and its laws at the feet of every State in the Union*. The laws must be executed by individuals acting within the several States, and if these may be exposed to penalties, and if the Courts of the Union cannot correct the judgments by which they may be enforced, the course of government may at any time be *arrested by the will of one of its members. Each member will possess a veto on the will of the whole.*

"We readily concur with the counsel for defendants in the declaration, that the case which has been put of direct legislative resistance for the purpose of approving the ac-

knowledged powers of government are extreme cases, and in the hope that they will never occur, but we cannot help believing that a general conviction of the total incapacity of the government to protect itself and its laws in such cases would *contribute* in no inconsiderable degree to their *occurrence.*" Alluding to subjects that might be expected to produce collisions: "Those collisions may take place in times of no extraordinary commotion. But a Constitution is formed for ages to come and is designed to approach immortality as nearly as human institutions can approach it. Its course cannot always be tranquil. It is exposed to storms and tempests, and its framers must be unwise statesmen *if they have not provided it, as far as its nature will permit, with the means of self-preservation from the perils it may be destined to encounter. No government ought to be so defective in its organization as not to contain within itself the means of securing the execution of its own laws against other dangers than those which occur every day.* Courts of justice are the means most usually employed, and it is reasonable to expect that government should repose on its own Courts rather than on others.

"It is very true, that whenever hostility to the existing system shall become universal, it will also be irresistible; the people made the Constitution and the people can unmake it. It is the creation of their will, and lives only by their will. But this supreme and irresistible power to make or unmake resides *only in the whole body of the people, not in any subdivisions of them. The attempts of any of the parts to exercise it is usurpation and ought to be repelled by those to whom the people have delegated the power of repelling it.*"—Cohens vs. Virginia, 6 Wheaton, 264. Language more pertinent and apposite to the very case under consideration, and to the objections to the

power exerted here, could scarcely be found—the subject of
the exercise of the jurisdiction a great State, no precedent
for the exercise of the power, its basis and support the
great principle of self-preservation and the duty of repel-
ing through the inherent functions of the department of all
assaults made upon it.    These should be carefully kept in
view in considering the legality of the present action,
which we now propose to consider in this restricted point
of view as to the authority to compel the attendance of the
absent officer.

It is not denied that compulsory process may be issued
against other officers of the Court—the Clerk and Sheriff,
Jurors, &c.   The power is full, ample and complete as to
them—not so as to the Judges, who are said to be exempt
from all action of this kind.   If this be so, certainly some
authority will be found in the books to sustain such dis-
tinction.   I have not been able to find it in my researches.
The law conferring the power is to this effect: "*All officers*
are punishable for corrupt and oppressive proceedings,
according to the nature of the offence, either by indict-
ment, attachment, action at the suit of the party injured,
loss of their office, &c.—6 Mod., 96.   But, besides the pun-
ishment by indictment, &c., *all Courts* have discretionary
power over *their officers*, and are to see that no abuses are
committed by them which may bring disgrace on the Courts
themselves.—4th Jacob's Law Dict. tit. Off. 440.   In gene-
ral, *all wilful breaches* of the duty of *an office* are for-
feitures of it, and punishable by fine, &c., for since every
office is instituted, not for the sake of the office but for the
good of some other, nothing can be more just than that he
who either neglects or refuses to answer the end for which
his office was ordained, should give way to others who are
both willing and able to take care of it, and that he should

32

be punished for his neglect or oppressive execution," &c. *Ibid.* 441.

To the same effect is the law laid down in Blackstone's Commentaries: "To this head of summary proceedings may be properly referred the method immemorially used by the Superior Courts of justice of punishing contempts by attachment and the subsequent proceedings thereon. The contempts that are thus punished are either direct, which openly insult or resist the powers of the Courts or the persons of the Judges who preside there, or else are consequential, which, without gross insolence or direct opposition, plainly tend to create a universal disregard of their authority. The principal instances of either sort that have been usually punishable by attachment are chiefly of the following kinds: those committed by inferior Judges and Magistrates (for causes stated,) by sheriffs, bailiffs, goalers and other officers, by attornies and solicitors, by jurymen, by witnesses, by parties to any suit or proceeding before the Court. Some of these contempts may arise in the face of the Court, as by rude and contumelious behavior, by obstinacy, perverseness or prevarication, &c., others in the absence of the party, as by disobeying and treating with disrespect the king's writ, *or the rules or process of the Court*, &c., and by anything in short that demonstrates a gross want of that regard and respect which, when once Courts of justice are deprived of, their authority (so necessary for the good order of the kingdom,) is entirely lost among the people."—4 Blackstone, 285. "The process of attachment for these and the like contempts must necessarily be as ancient as the laws themselves; for laws, without a competent authority to secure their administration from disobedience and contempt, would be vain and nugatory. A power therefore in the Supreme Courts of justice to suppress such contempts, by an imme-

diate attachment of such offender, results from the first principles of judicial establishments and must be an inseparable attendant upon every superior tribunal. Accordingly, we find it actually exercised as early as the annals of our laws extend; and though a very learned author seems inclinable to derive this process from the statute of Westmin. 2, 13th Ed., 1, (which ordains that in case the process of the King's Court be resisted by the power of any great man, the Sheriff shall chastise the resisters by imprisonment, and if the Sheriff himself be resisted, he shall certify to the Court the names of the principal offenders, their aiders, consenters, commanders and favorers, and by a special writ judicial they shall be attached by their bodies to appear before the Court, and if they be convicted thereof, they shall be punished, &c.,) he afterwards more justly concludes that it is a part of the law of the land and as such is confirmed by the statute of Magna Charta.

" If the contempt be committed in the face of the Court, the offender may be instantly apprehended and imprisoned at the discretion of the Judges, without any further proof or examination. But in matters that arise at a distance, and of which the Court cannot have so perfect a knowledge, unless by the confession of the party or the testimony of others, they either make a rule to show cause why an attachment should not issue against him, or in very flagrant instances of contempt, the attachment issues in the first instance."—4 Black., 286.

Thus by distinct declaration, without exception of any kind, *all officers* are punishable by attachment, and *all Courts* are bound to punish their officers for neglect of duty or other unbecoming conduct, either openly in Court or out of it. The only escape from such conclusion is, that the Judges are not officers or that each member constitutes

*the Court* so that he can prevent such action of the Court upon himself.

Each of these positions is alike untenable. Judges are in law treatises styled officers, chief officers of the Courts, and the Court consists of a majority of the Judges, if so many are present, and if not such as are present at the time and place fixed by law for holding its terms. This much we ascertain from the authorities cited that there is no distinction as to any offences committed by any officer—no exemption—all are embraced—all subject. Why make such exception to defeat the very object and purpose of the law? Why, if Judges commit offences prohibited by the laws, should they be exempt from their operation? Does their office give them power and capacity or the right to break the law with impunity? Are they exempt in other instances for injuries of a civil character, or for offences in a criminal point of view? If so, let it be known. They may be suitors and sued in all the Courts, from a Justice of the Peace to the Supreme Court, and the process of execution may go from this very Court to its officers to execute its mandates against either of them. If the exemption applies in the one instance, why not in all? How the creation of an office to administer the law can give immunity to the officer to disregard it, is difficult to conceive. Judges, so far from being exempt under the English laws, have, from the earliest period of English history, felt the weight of the criminal law in its severity. Thus, in the year 1295, heavy punishments were inflicted upon almost all the king's justices, even the most able. Sir Ralph Hingham, C. J. of the King's Bench, was said to have been fined 7,000 marks; Sir Adam Stratton, Baron of the Exchequer, 34,000—3 Black., 410; Hume's Eng., 375.

The expressions, "which openly insult or resist the

powers of the Courts or the persons of the Judges who reside there," quoted from Blackstone, have reference to rules and principles established and recognized by the common law of England to the effect that "where there are divers Judges of a Court of record, *the act of any one of them* is effectual, especially if their commissions do not expressly require more. Thus it appears that at common law each Judge has the *full judicial authority, unless he be expressly required to exercise it in conjunction with others*, as in the quorum clause of the commissioners in England."—Hawkin's Pleas of the Crown, Chap. Crim. Juris. This was relied upon by that eminent jurist, C. J. Ruffin, of the Supreme Court of North Carolina, to prove his position " that the common law deems it of such high consequence that the *judicial power shall never be suspended*, but that the tribunals of justice should at every term be always open to suitors, that *it adopted the principle that each one of the several Judges of a Court may hold it*."—4 Ire. L. R., 447.

It is not maintained that one Judge of the Supreme Court of the State is competent to hear and determine causes; far from it. The Constitution, declaring that "a majority of the Judges shall hold the sessions of the Supreme Court," and the law of 1845 " that three of the Justices (at that time a majority of the Court,) shall be a quorum to do business," equally forbid it; yet there is nothing which forbids his sitting to effect an organization of the Court. The 5th section of the act to organize the Supreme Court provides, "that if any one or two of the Justices are disqualified or disabled from hearing or determining a cause or causes, it shall be the duty of the Justices of the Court to notify any one or two of the Judges of the Circuit Court to attend and try and hear the said causes."

Now, obviously if two of the Circuit Judges be disqualified or disabled, the power of appointment devolves upon the remaining Justice who constitutes the Court for that purpose, and his duty is to give the notification required. Such has been the practice of the Court. The rescinding order passed by my Associates is as follows: "To guard against the recurrence of similar errors in future, it is made a standing of this Court that no entries shall be made upon the minutes thereof in vacation and without the concurring authority and consent of a *majority of the presiding Justices* thereof, unless the same be for the *adjournment or continuance* of the legal terms of the same, or to effect the organization provided by the 5th section of the act of 1851, organizing the Supreme Court."—See Minutes.

The power is conceded to less than a majority to adjourn and continue the legal terms or to effect the organization above alluded to, and thus is surrendered the entire question, in our conception; for, if the Circuit Judges disobey the order of the Justice notifying them to attend, they are clearly liable to attachment for disobedience to the order. The quotations already made from Blackstone establish this. Amongst the contempts enumerated are, "the disobeying or treating with disrespect the king's writ or the rules or process of the Court."—4 Black., 284. To the same effect is the decision of this Court in the case of Mitchell vs. Maxwell, in which the means of executing the law not being provided by it, the Court said: "The law is well settled, that whenever a power is given by statute, everything necessary to make it effectual is given by implication; for the maxim is, *quando lex aliquid concedit concedere videtur et id per quod devenetur ad illud.*"—2 Florida, 597, citing 1 Kent's Com., 465, &c. They therefore ordered the arrest of the citizen in case of his refusal

to answer as required. A single Judge having power to pass the order has power to enforce it. There is the authority of the Legislature with the aditional sanction of the Court itself. A like result would follow from the conceded power to one Judge to adjourn and continue the terms, which is a power likewise for purposes of organization, and carries with it the power of fine and imprisonment to prevent contempts of the Court in the execution of the duty.

With a power admitted for purposes of organization—with power to compel the attendance of a Judge or Judges, although of the Circuit, to effect this purpose, it would be difficult to resist the existence of the power to the full extent of organization. A power for a particular purpose is to effect that purpose, and the means are given adequate to the end. A power for the partial and not entire accomplishment of a purpose—to be exerted against some and not all the members of a Court—would be unheard of. Nor is it an answer to say that the order is addressed to the Circuit Judges and the compulsory power is confined to them alone. By no means. The notification makes them Judges of the Supreme Court *pro hac vice*, and it is for their refusal to attend and perform the duty which the law enjoins as Judges of the Supreme Court that they are to be held as in contempt. I have been asked, if the Chief Justice were absent, would the power exist to send for him? I answer unhesitatingly in the affirmative. It is vested in the Judge present and performing his duty, against all delinquents.

But the proceeding is harsh and unequal. It is not usually so considered when exercised by the Judges against other officers. It is every day's practice to proceed against sheriffs, clerks, jurors, attorneys and witnesses. So, too, in Congress and in the Legislature, to send for absentees in

case of a quorum not being present. In case of the Senate of the United States or our own State Senate sitting as a high court for the trial of an impeachment, no doubt could exist of their right to send for absent members, if needed for purposes of organization or other official action. The very fact of the frequent use of this power for this purpose by other deliberative bodies, without complaint, satisfactorily establishes the propriety of its use and is a full answer to all complaints of hardship and oppression.

The rule, it is said, should not apply to Judges of the Supreme Court, because they are the equals of each other, and neither can force the other to the performance of official duty. That a Judge refusing to attend Court is the equal in power of the one holding Court in pursuance of law, may not be maintained any more than that an officer or soldier who refuses to go into battle is the equal in any respect of one who is found at his post discharging his duty. Besides, compulsion is in no degree dependent upon station, nor is it the consequence of a difference in position. Very far from it. The different officers of government are all equal in the eye of the law. They may have different parts to perform, yet, with duty discharged, each is the equal of the highest—none inferior, unless he makes himself such by delinquency or conduct making compulsion necessarily applicable to him. The citizen in his natural capacity—the true sovereign and source of all power—was above law before entering into government, had the highest position, and yet he subjects himself to law, confiding his high powers to officers and requiring of them the enforcement of duty even against himself. To be above and beyond and exempt from law was the impotent claim of the worst of the kings of England and has no place in a government where all are equal before the law.

But, again, it is urged that impeachment is the true

remedy. Why so? Why fine and imprison in any case? Why not resort to that remedy in all cases? The distinction is most obvious. Impeachment removes the officer, attachment compels the performance of duty. A sheriff, clerk or other officer may be fined, whilst the remedy by impeachment would be unsuitable.

It is said, however, that in the instances of exertion of power by other bodies, there is an express grant, and, where this is the case, none can be implied. There will be found to be a mistake in this respect. In the case ex parte Henderson, the very point was considered and disposed of by quoting the opinions, on the same subject, of the Supreme Court of the United States. "It did not suit the purposes of the people in framing this great charter of our liberties (the Constitution of the U. S.) to provide for a minute specification of its powers or to declare the means by which these powers should be carried into execution. A Constitution which should contain an accurate detail of all the minute subdivisions of which its great powers will admit and of all the means by which they may be carried into execution, &c., would partake of the prolixity of a legal code and could scarcely be embraced by the human mind. Its nature, therefore, requires that only its great outlines should be marked, its important objects designated and the minor ingredients which compose those objects be deduced from the nature of the objects themselves."—2 Florida, 293, quoting McCullough vs. Maryland, 4 Wh., 407.

In Anderson vs. Dunn, the subject was still more particularly considered, in a case as to the power of the House of Representatives of the United States to punish for a contempt. It was expressly admitted that there was no power given by the Constitution to either House to punish

33

for contempt, except when committed by their own members; nor did the criminal or judicial power given to the United States in any part expressly extend to the infliction of punishment for a contempt of either House or any one co-ordinate branch of the government, yet the Court held that "there is not in the whole of that admirable instrument a grant of powers which does draw after it others, not expressed, but vital to their exercise, not substantive and independent, but auxiliary and subordinate." But if there is one maxim which necessarily overrides all others in the practical application of government, it is that the public functionaries must be left at liberty to exercise the powers which the people have entrusted to them. The interest and dignity of those who created them require the exertion of the powers indispensable to their creation. Nor is a casual conflict with the rights of particular individuals any reason to be urged against the exercise of such powers. That the safety of the people is the supreme law not only comports with but is indispensable to the exercise of those powers without which that safety cannot be guarded." They decided that the power existed by implication from necessity and on the principle of self-preservation.—See 6 Wheaton, 204.

By the Constitution of our State, the judicial power of the State, both as to matters of law and equity, is vested in the Courts. What is a power but the ability or faculty of doing a thing? What is the ability to do a thing but the power of employing the means necessary to its execution? The use of means to execute a power granted results by necessary and unavoidable implication from the very act of establishing a government and vesting it with certain powers; for, wherever the end is required, the means are authorized. "If there be any general principle which is inherent in the very definition of government and essential

to every step of the progress to be made by it, it is that every power vested in a government is in its nature sovereign and includes by force of the term a right to employ all the means requisite and fairly applicable to the attainment of the end of such power unless they are excepted in the Constitution or are inimical or contrary to the essential objects of society."—3 Story's Com. on Constitution, p. 117, § 1,240.

Unless we are greatly mistaken in the weight to be given to the law and authorities cited, the power exercised on this occasion is fully sustained, as well by express provision of the common law of England, the statutes of the State, the sanction and decisions of this Court itself and the decisions of other Courts of the highest respectability, and clearly given by implication, and has not the opposing declaration or opinion of a single text-book, rule or principle of law, or of a single judge or jurist.

I have the satisfaction to know that no indignity has been committed—no injury inflicted—no wrong done. The officer sent upon the mission performed his duty with all due respect and discretion, having upon his arrival at Jacksonville found the Judge apparently well. He informed him of the mandate, but forbore its execution, and on the morning fixed for his departure, the Judge being indisposed, he returned without him.

The terms of the Court have been since held and not adjourned, and the public business transacted and parties litigant no longer kept waiting; for, although the infirmity of the eyes has continued almost to the same extent, the Judge not having been able to read, yet there has been such an improvement as to enable him to write. Thus has this action, which the majority have assumed to condemn, been instrumental in preventing the delay of justice and in maintaining the efficiency of this

department of the government; and whilst my associate has not been molested nor disturbed, the moral force of the movement has been equally influential and effective.

Let the other side of the picture be presented, and suppose no action in the premises had been taken, but the presiding officer of the Court had remained in passive acquiescence, no terms held and nothing done, and it had been taken for granted that the Court could be rendered impotent whenever one of its members should determine not to join in its councils or obey its summons, or at his pleasure stay away, could public esteem in the institution have been any longer commanded, or would it not have deservedly lost all rightful claim to public confidence and respect as a co-ordinate department of the government? Having been the first to assert this power, as the representative of the Court, over an Associate for neglect of duty, I shall also be equally ready, under the like circumstances, to submit without question should the Court conceive it proper to exercise the same power over myself, and should feel humiliated to assert it as claimed against inferiors and subordinates only. Some notice is due of the action of the Court and a member of it after the award of the attachment. On the day fixed for the attendance (24th,) Justice DuPont entered a protest as well against the order of arrest as that of notification, committing himself beforehand to the condemnation of the measure. The two Associates, at the close of the session at Tallahassee, entered an order, upon full and mature consideration, that this order "be *considered as expunged from the records of the Court.*" With due respect, such action is wholly unknown to intelligent Courts and without warrant or authority. Protest, in legal language, is a legislative act or the document of a captain asserting damage or injury to his vessel. The term expunging has been used by legislative bodies very

rarely, as in the House of Commons in England in the case of Wilkes, with due deference improperly introduced into the Senate of the United States on the occasion of the protest of President Jackson, whose fame was not in the slightest advanced by the measure. My Associate DuPont is quite indignant that I have regarded the order as an act of censure. His error will probably be corrected by the remarks made by Mr. Webster and Mr. Calhoun during that memorable period. Thus the former: " That which made this resolution which we have now amended particularly offensive was this—it proposed to expunge our journal. It called on us to violate, to obliterate, to erase our own records. It was calculated to fix a particular stigma, a peculiar mode of reproach or disgrace on the resolution of March last. It was designed to distinguish it and reprobate it in some especial manner. The attempt to induce the Senate to expunge its journal has failed, signally and effectually failed. The record remains, neither blurred, blotted nor disgraced." This was on its rejection. Afterwards, on the occasion of its passage, Mr. Calhoun said: "No one, not blinded by party zeal, can possibly be insensible that the measure proposed is a violation of the Constitution. The Constitution requires the Senate to keep a journal, this resolution goes to expunge the journal. The Constitution says the journal shall be kept, this resolution says it shall be destroyed. They tell us that the resolution on your records is not to be expunged, but is only to be *endorsed expunged.* Really, sir, I do not know how to argue against such contemptible sophistry. You are going to violate the Constitution, and you get rid of the infamy by a falsehood. You yourselves say that the resolution is expunged by your order—yet you say it is not expunged. You put your act in express words—you record

it and then turn round and deny it," &c.—1 Benton's 30 years, 550, 728.

Such is the act which my associates have thought worthy of imitation in a Court of justice, the Supreme Court of the State. In other respects, the reference is an unfortunate one for them. None of the actors in that scene ever failed or refused to discharge a public duty, nor were they at any time the apologists of a known delinquent. The names of Jackson, of Calhoun, Clay and Webster, even of Benton himself, are free from such reproach.